# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL D. VAN DEELEN,** | ) | |
| | ) | |
| **Plaintiff.** | ) | |
| | ) | |
| **v.** | ) | **Case No. 04-989-CV-W-GAF** |
| | ) | |
| **CITY OF KANSAS CITY, MISSOURI,** | ) | |
| **et. al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

Four dispositive Motions are presently pending before the Court in the above-captioned matter.

Motions for Summary Judgment have been filed by the Plaintiff, Michael D. Van Deelen ("Van Deelen")

(Doc. #68), the City Defendants[1] (Doc. #73), and the Human Resources Board Defendants[2] (Doc. #71).

The HR Board has also filed a Motion for Judgment on the Pleadings asserting that as a department of the

City, it is not a separate, juridical entity. (Doc. #33).

　　　　Upon careful consideration of the facts and arguments submitted by the parties,

• 　　　The HR Board's Motion for Judgment on the Pleadings is GRANTED. (Doc. #33).

• 　　　The City Defendants' Motion for Summary Judgment is GRANTED in part and DENIED

　　　　　in part. (Doc. #73).

---

[1]The City of Kansas City, Missouri ("City"), Wayne Cauthen, John Franklin, John Thigpen, Gail Roper, Richard Razniak, Beth Lacey, Rick Brisbin, Roy Greenway and Patrick Reisenbichler are collectively referred to as the "City of Kansas City Defendants."

[2]The City of Kansas City, Missouri Human Resources Board ("HR Board") and Joseph Moreland are collectively referred to as the "Human Resources Board Defendants."

1

- The Human Resources Board Defendants' Motion for Summary Judgment is MOOT. (Doc. #71).

- Van Deelen's Motion for Summary Judgment is DENIED. (Doc. #68).

## DISCUSSION

### I.    Facts

Van Deelen contends that several of his Constitutional rights were violated when he was terminated from his employment with the City for violating the City's residency policy. Van Deelen was hired as a Systems Analyst in the City's Information Technology Department ("ITD") on August 14, 2000. (Doc. #74, ¶ 1; Doc. #68, ¶ 1). At the time, Van Deelen lived in Eudora, Kansas with his wife and son. (Doc. #68, ¶ 1). Van Deelen acknowledges receiving the City's Human Resources Rules and Policy Manual when he was hired. (Doc. #74). The City's residency requirement is set forth in this Manual at Section 3.15:

> All applicants for employment with the City, who are non-residents at the time of appointment, shall establish residence and domicile within the City limits within nine months after the date of appointment. Any employee whose work is of such a nature that he or she spends 75 percent of their work time outside the city limits shall be exempted from this residence and domicile requirement.

(Doc. #74, ¶ 1, Ex. F). Upon being hired, Van Deelen was told by Defendant Gail Roper ("Roper"), Director of the City's ITD, that he had to move within the city limits of Kansas City, Missouri, within nine months to satisfy the City's residency requirement. (Doc. #74, ¶ 2-3, Doc. #82, ¶ 3). Van Deelen signed a document on August 21, 2000, acknowledging that he would move to Kansas City, Missouri within nine months of his employment date. (Doc. # 68, ¶ 16). The City's residency requirement mandated that Van Deelen move to Kansas City, Missouri on or before May 14, 2001. Id.

2

Van Deelen asserts that prior to the expiration of the nine month period, he contacted the City's Human Resources Department and asked them to provide him with any written guidelines and/or procedures explaining what a City employee must do to satisfy the City's residency requirement. (Doc. #68, ¶ 18). Van Deelen claims that he was told by Human Resources personnel that no written guidelines or procedures existed and he was further told that the City had no formal definition of "residency." Id. Van Deelen contends Human Resources personnel told him that the residency requirement applied only to him and not to his family. Id. Finally, Van Deelen states that he was informed by Human Resources Department personnel that he could satisfy the City's residency requirement by renting an apartment in Kansas City, Missouri and staying in the apartment on nights before work days (i.e. Sunday, Monday, Tuesday, Wednesday, and Thursday). Id.

On May 1, 2001, Van Deelen leased Apartment 16 at 3004 Grand Street in Kansas City, Missouri. (Doc. # 68, ¶ 19, 20). He promptly reported his new address to the City and stayed at this apartment on nights prior to work days. Id. However, Van Deelen's family did not move into the apartment but rather remained in their home in Eudora, Kansas because Van Deelen's son was a senior in a Kansas high school and Van Deelen's wife worked in Lawrence, Kansas. (Doc. #68, ¶ 21). Van Deelen, whose son did not have his own car, drove from his apartment in Kansas City to Eudora every morning and evening to take his son to and from school and sports practices. (Doc. #68, ¶ 22, 23).

In the Summer of 2001, Van Deelen contends that Defendant Roper waived the City's residency requirement with respect to Van Deelen. (Doc. #68, ¶ 26). Despite this waiver, Van Deelen continued to lease the apartment on Grand Street. Id. Van Deelen notes that pursuant to the City's Human Resources Rules and Policy Manual, Section 7.1, individual City Departments have the authority to make

3

rules governing the conduct and performance of their employees so long as these rules are approved by the Human Resources Director and a copy furnished to each employee to whom the rule applies. (Doc. #68, ¶ 27). On March 21, 2002, Defendant Roper issued an interdepartmental communication in which she formally acknowledged that the City's residency policy had been waived with respect to Van Deelen.[3] (Doc. #68, ¶ 28). The Interdepartmental Communication was sent to Mary Miller, Assistant Director, ITD, by Gail Roper, Director, ITD, and stated:

> Michael Van Deelen can be deemed a critical employee due to his work with the Fire Cad system. We therefore waive the City of Kansas City's residency requirement as it applies to him. Michael is free to move back to his family's residence in Kansas if he chooses to.

(Doc. #68, Ex. S). The memo was also sent to Gary O'Bannon, Deputy Director of Human Resources. Id. The Defendants contend that pursuant to Section 2-972 of the City's ordinances, discussed *infra*, no one, including a Department Director can waive the City's residency requirement. (Doc. # 78, ¶ 28).

### A.    The City's Residency Policy

The City's residency policy is codified in Sec. 2-972 of the Code of Ordinances:

The following conditions regulating residence shall apply to all non-elected city employees:
(a)    Preference for employment shall be given to residents of the city for all positions in the classified service.
(b)    Applicants for employment with the city, who are nonresidents at the time of appointment, shall establish residence inside the city limits within nine months after the date of appointment. In the discretion of the director of human resources, persons who, at the time the nine months expires, have entered into a contract to purchase a residence for their use and who are prepared to move in within a reasonable time not to exceed six months may be deemed to have met this

---

[3]Van Deelen claims that following the formal waiver of the residency requirement, he reminded Defendant Roper to remove the August 21, 2000 acknowledgment document that had been placed in his personnel file when he began working for the City. (Doc. #68, ¶ 29). The signed acknowledgment document is no longer in Van Deelen's personnel file. (Doc. #68, ¶ 30).

4

requirement.

(c)     Any employee whose work is of such a nature that he spends 75 percent of his work time outside the city limits shall be exempted from this residence requirement.

(d)     Residence is defined as the place where a person has his true, fixed, and permanent home and principal establishment and to which, whenever he is absent, he has the intention of returning. A person satisfies the residence requirement if a portion of the lot or parcel of land on which his residence is located is within the city limits.

(e)     Any employee who has established a residence within the city limits and who subsequently moves his place of residence outside the city limits shall forfeit his position of employment with the city.

(f)     Non-elected employees of the city failing to comply with the provisions of this section will be dismissed from the municipal service forthwith and automatically removed from the payroll by the human resources director.

(g)     The director of human resources is authorized to promulgate rules on residence consistent with this ordinance, subject to City Manager approval.

(h)     This ordinance defines residence for City employment purposes only.

Defendant John Thigpen ("Thigpen") was the City's Director of Human Resources from September 1997 until December of 2003. (Thigpen Dep. 4:5-8). Defendant Thigpen testified in his deposition that he had no knowledge of whether or not the definition of residency was discussed in the training sessions provided new City employees. (Thigpen Dep. 16:3-25). Defendant Thigpen later testified that during new employee orientation, a new employee may ask a question related to the City's residency policy and receive an answer, but the City "had no policies where we sat down and said to each employee, here's ordinance 2-972 and this is exactly what it means." (Thigpen Dep. 43:10-21). Furthermore, the City Defendants admit that the City does not have any policies or ordinances which govern residency determination investigations or the surveillance of employees during those investigations. (Doc. #68, ¶ 35; Doc. # 78, ¶ 35).

According to Defendant Thigpen, employees could seek advice on the City's residency policy from

one of the City's approximately 200 supervisors. (Thigpen Dep. 72:10-12, 79:8-25). Defendant Thigpen stated that these supervisors should not give their personal opinions on the policy but rather *should* consult with the Human Resources Department before offering their advice. (Thigpen Dep. 79:22-25) (emphasis added). Defendant Beth Lacey, the Principal Assistant to the Director of the ITD, also testified that she assumed that supervisors would get the Human Resources liaison, the Law Department, Human Resources, and the general auditor involved in responding to an employee's question about the residency policy. (Lacey Dep. 87:6-88:3). However, Defendant Lacey was not sure how supervisors were actually handling these questions. Id. Despite the fact that Defendant Thigpen expected the City's supervisors to respond to employee inquiries regarding the City's residency policy, Defendant Thigpen stated that he never provided Defendant Roper with any training sessions in which the definition of residency was discussed. (Thigpen Dep. 15:22-16:2), Defendant Thigpen further testified that the City did not have any policy in which Thigpen instructed the department heads on what Sec. 2-972 of the Code of Ordinances meant. (Thigpen Dep. 43:22-44:5).

While employed as the City's Director of Human Resources, Defendant Thigpen asserts that he was never asked to give an opinion as to what was necessary to satisfy the City's residency requirement. (Thigpen Dep. 40:18-23). Rather, Defendant Thigpen contends that it was his responsibility "to promulgate the residency ordinance consistent with the human resource rules and regulations." (Thigpen Dep. 40:2-4). However, Defendant Thigpen testified that if he had been asked that question, "it would have been one of [his] duties to interpret – to attempt to interpret the language in the ordinance." (Thigpen Dep. 40:24-41:5). When asked to give the "operative definition of residency," Defendant Thigpen responded:

> I would say during my tenure as director of human resources we tended to use the

definition that was fixed in the ordinance[4], and specifically we talked about where an employee spent the majority of their time. Where they left from, where they came back to, where they intended to return, where their family was.

(Thigpen Dep. 14:9-15). Throughout his deposition, Defendant Thigpen repeatedly testified that an employee's compliance with the City's residency policy would be determined based on the "preponderance of evidence." (Thigpen Dep. 33:17, 36:16-17, 47:4-3, 11; 50:10-11 (continuum of the evidence); 70:12-13). In his deposition, Defendant Thigpen was unable to define "permanent home," "true home" and "fixed home" they appear in Sec. 2-972. (Thigpen Dep. 39:5-23).

## B. Investigation into Van Deelen's compliance with the City's residency policy

On or about September 30, 2002, the City launched an investigation into Van Deelen's compliance with the City's residency policy. (Doc. #74, ¶ 6, Ex. G, K, L; Doc. #68, ¶ 37). It is unclear from the record who initiated the residency complaint against Van Deelen. (Doc. #68, ¶¶ 40-44). Defendant Roy Greenway ("Greenway"), who was responsible for conducting residency investigations, with the assistance of two City employees, Brian Loopey ("Loopey") and Don Jarrett ("Jarrett"), conducted surveillance on Van Deelen's activities to determine if Van Deelen was complying with the City's residency policy. (Doc. #74, ¶ 6; Doc. #68, ¶ 36). Three documents were attached to the City Defendant's Motion for Summary Judgment evidencing the surveillance of Van Deelen: Ex. G, "Detail Surveillance Record"; Ex. K, "Mike Van Deelen Surveillance Record"; and Ex. L, Time and Cost Summaries for Loopey and Jarrett.[5] According to these documents, Loopey, Jarrett and Greenway observed Van Deelen as follows:

_____

[4]The Court notes that the definition of "residence" which appears in Sec. 2-972(4) became part of the ordinance following the October 17, 2002 amendments.

[5]Van Deelen also attached these documents to his Motion for Summary Judgment. (Doc. #68, Ex. 4, 5, and 8).

7

| Date [6] | Length of Surveillance | Observations |
|---|---|---|
| 9/30/2002 | [7] 1:00 p.m. – 7:30 p.m.(Loopey) 12:30 p.m. – 6:30 p.m. (Jarrett) | Observed Van Deelen departing from work at 4:05 p.m. and arriving at the Eudora, KS address at 5:00 p.m. |
| 10/1/2002 | [8] Surveillance begins at 5:00 a.m. | Observed Van Deelen leaving the Eudora, KS address at 6:41 a.m., dropping off child at Shawnee Mission West School, and arriving at Pioneer College at 9:15 a.m. |
| 10/2/2002 | Surveillance begins at 5:30 a.m. | Observed Van Deelen leaving the Eudora, KS address at 6:40 a.m., dropping off child at Shawnee Mission West School, and arriving at work at 7:29 a.m. |
| 10/3/2002 | Surveillance begins at 5:00 a.m. | Observed Van Deelen leaving the Eudora, KS address at 6:45 a.m., dropping off child at Shawnee Mission West School and arriving at work at 7:35 a.m. |
| 11/5/2002 | 4:30 a.m. – 9:00 a.m. (Loopey) 4:30 a.m. – 9:00 a.m. (Jarrett) | Observed Van Deelen leaving the Eudora, KS address at 6:57 a.m. and arriving at work at 7:49 a.m. |
| 11/6/2002 | 4:30 a.m. – 9:00 a.m. (Loopey) 5:00 a.m. – 9:00 a.m. (Jarrett) | Observed Van Deelen leaving the Eudora, KS address at 6:59 a.m., dropping off child at school in Overland Park, and arriving at work at 7:49 a.m. |
| 11/7/2002 | 4:30 a.m. – 11:30 a.m. (Loopey) 5:00 a.m. – 11:00 a.m. (Jarrett) | Observed Van Deelen leaving the Eudora, KS address at 6:41 a.m., dropping off child at school in Overland Park, and arriving at work at an unspecified time. |

---

[6]All of the dates and descriptions of surveillance are derived from the Detail Surveillance Record (Doc. #74, Ex. G) and the Mike Van Deelen Surveillance Record (Doc. #74, Ex. K).

[7]Length of Surveillance for 9/30/2002, 11/5/2002, 11/6/2002, and 11/7/2002 are derived from the Time and Cost Summaries for Loopey and Jarrett (Doc. #74, Ex. L).

[8]The time surveillance began on 10/1/2002, 10/2/2002, and 10/3/2002 is derived from the Detail Surveillance Record (Doc. #74, Ex. G). The Court notes that these times are generally not consistent with the "begin times" in the Time and Cost Summaries for Loopey and Jarrett. (Doc. #74, Ex. L). Loopey asserts a "begin time" of 4:00 a.m. on all three dates. Id. Jarrett asserts a begin time of 4:30 a.m. on 10/1/2002, 5:00 a.m. on 10/2/2002, and 4:30 a.m. on 10/3/2002. Id.

| 11/8/2002 | unknown | Roy Greenway and Dave Severnuk observed Van Deelen exiting the Eudora, KS address at 7:02 a.m. |
|---|---|---|

According to the Detail Surveillance Record, Jarrett and Loopey took videos of Van Deelen dropping his son off at school in Overland Park on November 6, 2002 and November 7, 2002. (Doc. #74, Ex. G). According to Van Deelen, the November 8, 2002 surveillance was also videotaped. (Doc. #68, ¶ 28).

Van Deelen notes that additional surveillance was conducted on 11/4/2002, 11/5/2002 and 11/6/2002 according to the Time and Cost Summaries for Loopey and Jarrett (Doc. #74, Ex. L) that was not recorded in either the Detail Surveillance Record (Doc. #74, Ex. G) or the Mike Van Deelen Surveillance Record (Doc. #74, Ex. K). This additional surveillance is summarized as follows:

| Date | Length of Surveillance | Observations |
|---|---|---|
| 11/04/2002 | 2:30 p.m. – 6:30 p.m. (Loopey)<br>4:00 p.m. – 5:00 p.m. (Jarrett) | Followed Van Deelen "from work to residence" |
| 11/05/2002 | 2:30 p.m. – 5:00 p.m. (Loopey)<br>3:00 p.m. – 5:00 p.m. (Jarrett) | Followed Van Deelen "from work to residence" |
| 11/06/2002 | 1:00 p.m. – 6:30 p.m. (Loopey)<br>11:30 a.m. – 6:00 p.m. (Jarrett) | Followed Van Deelen "from work to residence" |

The Court notes that "residence" is not identified in the Time and Cost Summaries as either the Eudora, Kansas address where Van Deelen's wife and son live or the apartment he rented at 3004 Grand Street in Kansas City, Missouri. (*See* Doc. #74, Ex. L). The Court further notes that the same notation ("D" in the "Purpose Description" column which indicates "Follow from Work to Residence") is used by Loopey and Jarrett on 9/30/2002, when Van Deelen was observed leaving work and arriving at the Eudora, Kansas address where his wife and son live. Id. However, Van Deelen contends that on

November 4, 5 and 6, 2002, he went directly from work to his apartment at 3004 Grand Street in Kansas City, Missouri. (Doc. #82, ¶ 7).

### C. *Van Deelen's suspension without pay for violating the City's residency policy*

On November 8, 2002, Defendant Greenway and Dave Severnuk observed Van Deelen at the Eudora, Kansas address. (Doc. #74, ¶ 9; Doc. #68, ¶ 68). At that time, Defendant Greenway informed Van Deelen that his residency status was being questioned and he needed to attend a meeting that afternoon to discuss the issue. (Doc. #74, ¶ 9, Ex. H; Doc. #68, ¶ 69). Defendant Greenway, Dave Severnuk and a City security guard attended the afternoon meeting. (Doc. #74, ¶ 9; Doc. #68, ¶ 70).

During the afternoon meeting, Defendant Greenway informed Van Deelen that he had been under surveillance by Loopey, Jarrett and Defendant Greenway. (Doc. #74, ¶ 9, Doc. #68, ¶ 74). Defendant Greenway informed Van Deelen that the three men had observed Van Deelen taking his son to school in the morning and taking him to the Eudora, Kansas residence in the evening. Id. Van Deelen explained the circumstances which caused him to have to shuttle his son back and forth to and from school. Id. Van Deelen also provided Defendant Greenway with a copy of the lease for the apartment at 3004 Grand Street in Kansas City, Missouri. Id. Van Deelen also gave Defendant Greenway other documentation including cancelled rent checks and mail Van Deelen had received from the City and others at the Grand Street apartment. Id. Additionally, Van Deelen produced a copy of the March 21, 2002 Interdepartmental Communication from Defendant Roper which waived the residency requirement as applied to Van Deelen. (Doc. #68, ¶ 73).

Van Deelen contends that Defendant Greenway asked Van Deelen to resign his position with the City at the November 8, 2002 afternoon meeting. (Doc. #68, ¶ 75). When Van Deelen refused to resign,

Defendant Greenway informed Van Deelen that he was being suspended from his employment with the City for violating the City's residency policy. (Doc. #74, ¶ 10; Doc. #68, ¶ 76).[9]

### D.    The Predetermination Hearing

On November 22, 2002, Defendant Pat Reisenbichler ("Reisenbichler") sent Van Deelen a letter informing him that City management had recommended that his employment be terminated due to violation of the following rules and ordinances as specified in the Human Resources Rules and Policy Manual:

- Section 3.15 Residency requirement, i.e. violation of residency requirement per Ordinance 981023.
- Section 7.2 - Failure to cooperate in a lawful investigation or legal proceeding by the City i.e., providing dishonest responses to questions in a lawful investigation.
- Section 7.6 - Misconduct i.e., violation of residence and domicile requirements.

(Doc. #78, Ex. I). The letter further notifies Van Deelen that a Predetermination Hearing regarding these alleged violations had been scheduled for December 6, 2002 over which Defendant Reisenbichler would

_____

[9]Van Deelen contends that Defendant Greenway was not authorized to suspend Van Deelen on November 8, 2002. (Doc. #68, ¶ 77). The City Defendants admit that this is true, but claim that it is irrelevant. (Doc. #78, ¶ 77). In fact, it does appear that Defendant Greenway did not have the authority to suspend Van Deelen. Defendant John Thigpen, the City's Director of Human Resources during the time of Van Deelen's employment, testified in his deposition that "Mr. Greenway's job was to investigate allegations of violations of the residency policy. Mr. Greenway could take no further action other than to turn his results over to the department. By charter only departments could take disciplinary action against a person." (Thigpen Dep. 83:3-8). Furthermore, Sec. 2-1112 of the Code of Ordinances governs the suspension of employees and provides: ". . . a department head may for cause suspend an employee without pay for a period or periods not exceeding 30 calender days in any 12 months; however, no single suspension shall be for more than 15 calender days." (Doc. #74, Ex. B; Doc. #68, Ex. R). Defendant Greenway was not the head of the City's ITD, wherein Van Deelen was employed, but rather was the internal auditor for the City. (Doc. #68, Ex. G at 56:6-8). Accordingly, it appears that Van Deelen's November 8, 2002 suspension violated Sec. 2-1112 of the Code of Ordinances. Although this may relate to the question of whether Van Deelen was wrongfully terminated, it is not relevant to Van Deelen's Constitutional claims.

Case 4:04-cv-00989-GAF   Document 116   Filed 01/30/06   Page 11 of 39

preside.  Id.  The Predetermination Hearing would be held pursuant to Section 7.5 of the Human Resources Rules and Policy Manual.

On December 6, 2002, a Predetermination Hearing regarding the termination of Van Deelen's employment was held at the Municipal Court Building in Kansas City, Missouri.  (Doc. #74, Ex. J).  The following people attended the Hearing:

> Van Deelen, Systems Analyst
> Defendant Greenway, Internal Auditor
> Dave Severenuk, Security Manager, Office of the City Manger
> Defendant Beth Lacey, Principal Assistant to the Director, ITD
> Defendant Richard Razniak, Assistant to the Director, ITD
> Phillip Moore, Director of Security, Municipal Courts
> Defendant Reisenbichler, Hearing Officer

Id.  The parties dispute the nature, extent and reliability of the evidence produced at the Predetermination Hearing. (*See* Doc. #74, ¶ 12; Doc. #82, ¶ 12; Doc. #68, ¶¶ 84-90).  However, because the question of whether or not Van Deelen was wrongfully terminated is not presented in this case, the Court finds it unnecessary to detail the disputed evidence.

Based on the evidence presented by both the City and Van Deelen in the Predetermination Hearing, Defendant Reisenbichler recommended to Defendant Roper, Director of the City's ITD, that Van Deelen's employment be terminated for violating the City's residency policy.  Id. On December 19, 2002, Defendant Roper sent Van Deelen a letter stating that she had been notified that the Predetermination Hearing officer concurred with the recommended disciplinary action of termination for Van Deelen's violation of the City's residency policy.  (Doc. #68, Ex. T).  Defendant Roper notified Van Deelen that pursuant to Sec. 2-1114 of the Code of Ordinances, he would be placed on a 15-day suspension prior to the termination of his employment which would begin on December 19, 2002 and end on January 2, 2003.  Id.  According to

12

the letter, the termination of Van Deelen's employment would become effective on January 3, 2003.  Id.

**E.    *The Human Resources Board Hearing***

Section 2-1114 of the Code of Ordinances and Rules 7.5[10] and 8.1[11] of the City's Human Resources Rules and Policy Manual provide a City employee whose employment has been terminated the right to appeal said termination to the HR Board.  (Doc. #68, ¶ 113).  Sec. 2-1114 governs dismissals and provides in part (c): "Any regular employee [dismissed pursuant to Sec. 2-1114] shall have the right to appeal in writing within ten days of the date of receipt of the letter of dismissal to the HR Board and shall be granted a hearing as provided for in Sec. 125 of the Charter."  (Doc. #68, Ex. R).  Section 125 of the City Charter provides in relevant part:

> Any permanent employee in the classified service of the city who shall be removed or reduced in rank or suspended by an appointing authority shall have the right to have such action of the appointing authority reviewed by the personnel board upon filing with the director of personnel within ten (10) calender days after the effective date of such removal, reduction in rank or suspension, a written request for review by said personnel board, whereupon the personnel board shall grant a public hearing within thirty (30) calender days after the filing of such request.  Reviews by the board of such removals, reductions in rank or suspensions shall be conducted under such rules and regulations as the board may

---

[10]Rule 7.5 of the City's Human Resources Rules and Policy Manual governs Predetermination Hearings and provides in relevant part: "After the Predetermination Hearing results, any permanent employee in the classified service who is suspended, demoted, or discharged may appeal in, writing, for a hearing to the Personnel Board within ten calender days after the effective date of such suspension, demotion, or discharge.  This appeal must be filed, in writing, in the office of the Human Resources Director."  (Doc. #68, Ex. O).

[11]Rule 8.1 of the City's Human Resources Rules and Policy Manual governs appeals and states in its entirety: "Any regular employee who is suspended, removed, or reduced in pay shall have the right to appeal this action to the Personnel Board.  An appeal must be filed with the Human Resources Director within ten (10) calender days after the effective date of such disciplinary action.  The appeal must be in writing and set forth the reasons why the disciplinary action is believed to be improper."  (Doc. #68, Ex. O).

13

adopt.

(Doc. #68, Ex. W). Pursuant to Sec. 125, the HR Board's review of an adverse employment action is conducted pursuant to the Rules and Regulations adopted by the HR Board. Section 16 of the Rules and Regulations of the HR Board provides: "Hearings before the Board constitute contested cases as set forth in Chapter 536, Revised Statutes of Missouri. The Board and its proceedings will adhere to all applicable sections by Chapter 536, RSMo."

Pursuant to this authority, Van Deelen appealed the termination of his employment to the HR Board. (Doc. #74, ¶ 14). Hearings were held and evidence taken in HRB Case No. 02-16 on March 4, 2003, May 13, 2003, and August 5, 2003. Id. The following individuals testified at the hearing: Van Deelen, Defendant Lacey, Defendant Razniak, Mary Miller, Defendant Greenway, Don Jarrett and Brian Loopey. Id.

During the hearing, the City's attorney introduced Sec. 2-972 of the Code of Ordinances, as amended, into evidence as HRB Exhibit 3. (Doc. #68, Ex. G - HRB Vol. I, 56:6-57:19). Defendant Greenway testified that HRB Exhibit 3, Sec. 2-972 of the Code of Ordinances, constituted a copy of the City's residency requirement which his investigation revealed Van Deelen had violated. Id. During his testimony before the HR Board, Defendant Greenway initially stated that he didn't know of an "operative definition" of residence used by the City. (Doc. #68, Ex. H - HRB Vol II, 26:20-27:4). Rather, Defendant Greenway determined a person's residence based on his surveillance and interview of the employee, "a combination of things observed and discussed." Id. at 27:5-16. However, after the City's Attorney reminded Greenway of the definition of residence which appears in Section (4) of Sec. 2-972, Greenway testified that the definition found therein was the "legal definition" of residence but "there has to be a

14

practical implementation and that's where I focus more on." Id. at 27:17-28:9.

During the hearings, Defendant Greenway testified that, as part of the City's investigation into Van Deelen's residency status, Van Deelen had been surveilled by Jarrett and Loopey. (Doc. #68, ¶ 132). The "Detail Surveillance Record" was introduced into evidence as HRB Exhibit 11. (Doc. #68, Ex. 4). A summary of the surveillances entitled "Mike Van Deelen Surveillance Record" was introduced into evidence as HRB Exhibit 14. (Doc. #68, Ex. 5). These were the only surveillance records introduced by the City or its employees during the hearings before the HR Board. (Doc. #68, ¶ 133). Defendant Greenway testified that HRB Exhibit 14 constituted the entirety of the City's surveillance of Van Deelen with the caveat that if the individuals performing the surveillance miss the individual under surveillance at either the beginning or end of a trip, the surveillance was not recorded. (Doc. #68, Ex.H - HRB Vol II, 4:2-8:4). Jarrett similarly testified that HRB Exhibit 14 revealed all the surveillance related to Van Deelen's alleged violation of the City's residency policy. (Doc. #68, Ex. I - HRB Vol III, 10:20-11:14). Jarrett and Loopey testified that all of their surveillances of Van Deelen were done while they were working together. (Doc. #68, Ex. H - HRB Vol II, 251:7-14; Ex. I - HRB Vol III, 40:19-25). Greenway testified that all the surveillance he relied upon in recommending that Van Deelen's employment be terminated is contained in HRB Exhibit 11 and 14. (Doc. #68, Ex. H - HRB Vol II, 4:2-8:4).

Prior to the hearing before the HR Board, Van Deelen issued subpoenas duces tecum to Jarrett, Loopey and Defendant Greenway directing them to bring "all documents and records detailing or related to the surveillance of Michael Van Deelen." (Doc. #68, Ex. 7). The City admits that Jarrett, Loopey and Defendant Greenway failed to bring all of their notes and records related to the surveillance of Van Deelen and that surveillance involves a lot of paper work. (Doc. #68, Ex. Q, ¶ 32). On the first day of the

15

hearing, March 4, 2003, Van Deelen questioned Jarrett about Exhibit 11, the "Detail Surveillance Record." (Doc. #68, Ex. G - HRB Vol I, 28:7-31:10). Jarrett testified that he had filled out the "Detail Surveillance Record" from notes that he had taken. Id. Van Deelen asked why he had not produced these notes pursuant to the subpoena. Id. Jarrett responded that he didn't have any notes. Id. Van Deelen sought a continuance so that Jarrett could bring the records Van Deelen sought pursuant to the subpoena. Id. The HR Board asked Jarrett if he had any other records. Id. Jarrett responded, "I have some records someplace, sir. They're just notes that I keep and I take the notes and transcribe them to make an official document." Id. The HR Board denied Van Deelen's request for a continuance stating that the record would reflect that Jarrett may have some other notes that were the basis upon which he prepared the surveillance report. Id.

On the second day of the hearing, May 13, 2003, Van Deelen again asked Jarrett to produce the notes he had used to prepare the "Detail Surveillance Record." (Doc. #68, Ex H - HRB Vol II, 241:1-245:23). Van Deelen asserts that Jarrett was told in the prior hearing to produce the notes at this subsequent hearing. Id. Jarrett responded that he didn't recall being told to bring the notes. Id. Jarrett testified that he does a lot of surveillance and in order to maintain his records, he takes notes. Id. However, once he prepares a surveillance log, he discards his notes. Id. Jarrett believes that he has probably destroyed the notes he used to prepare the "Detail Surveillance Record." Id. Van Deelen requested that Jarrett be held in contempt for destroying documents that Jarrett asserted he had on the first day of the hearing and now asserts have been destroyed. Id. The HR Board denied Van Deelen's request stating it lacked the contempt powers of a judge. Id. On the third day of the hearing, August 5, 2003, Jarrett reiterated that he had destroyed his notes after preparing the "Detail Surveillance Record." (Doc.

16

#68, Ex. I - HRB Vol III, 18:5-20:20).

At the August 5, 2003 hearing, Loopey appeared as a witness for the City. (Doc. #68, Ex. I - HRB Vol III, 36:1-41:23). Loopey testified that he has two jobs. Id. One involved performing surveillances under the direction of Defendant Greenway. Id. Loopey was also an undercover narcotics officer. Id. Loopey refused to answer questions about his job as an undercover narcotics officer claiming that his responses may jeopardize ongoing narcotics investigations. Id. The HR Board recognized that Van Deelen may wish to ask Loopey questions about his background and expertise, but advised Van Deelen to proceed with questions related to Loopey's involvement in the surveillance of Van Deelen and subsequently revisit Loopey's background and expertise if it remained relevant. Id. Loopey testified that he turned in a log to Defendant Greenway of the surveillance he conducted on Van Deelen with Jarrett. Id. Loopey stated that these logs were handwritten and consisted of times and dates and there were never any real notes on them. Id. Loopey testified that he had given all the records that would be subject to the subpoena to Defendant Greenway and he did not think it was necessary to attempt to locate these documents prior to the hearing. (Doc. #68, Ex. I - HRB Vol III, 50:11-51:2).

During discovery in the present case, the City's attorney produced the Time and Cost Summaries for Jarrett and Loopey pursuant to Van Deelen's request for the surveillance investigation records that have been completed by Jarrett and Loopey. (Doc. #68, ¶ 146). As noted above, these Time and Cost summaries revealed additional surveillance of Van Deelen that was conducted on November 4, 5 and 6, 2002 and was not included in either the "Detail Surveillance Record" or the "Mike Van Deelen Surveillance Record." Van Deelen claims that his procedural due process rights were violated when Loopey, Jarrett and Defendant Greenway failed to produce these documents pursuant to the subpoena duces tecum issued

17

in the HR Board hearings.

As noted above, the record reveals that videotapes exist of the surveillance conducted on November 6, 2002 and November 7, 2002 by Jarrett and Loopey and on November 8, 2002 by Greenway and Severnuk. On May 13, 2003, Defendant Greenway testified that he did not bring the video footage to the hearing, but if excused from the hearing, he could obtain the camera which contained the footage.[12] (Doc. #68, Ex. H - HRB Vol II, 19:1-20:6). Following a break in the hearing, Van Deelen asked about the status of obtaining the video footage of the surveillance. (Doc. #68, Ex. H - HRB Vol II, 186:21-187:6). The City's attorney stated that Defendant Greenway was not sure if the footage still existed because he represented to her that it was his practice to tape over the footage after it has been transferred to video. Id.

At the August 5, 2003 hearing before the HR Board, the City's attorney stated that Greenway had brought the original cassette from the video recorder that showed the time stamp of the surveillances which Van Deelen had requested in the May 13, 2003 hearing. (Doc. #74, Ex. R, 125:8-15). Van Deelen refused to review the video, stating his belief that the "evidence has been doctored because Mr. Greenway stated that it had been erased." (Doc. #74, Ex. R, 125:16-126:6). Instead, Van Deelen preferred to "go with what is on the record," i.e. that the video had been erased. Id.

The City asserts that the videotape surveillance of Van Deelen was played at the March 4, 2003 hearing before the HR Board during Jarrett's testimony and Van Deelen cross-examined Jarrett about the videotape at that hearing. (Doc. #74, ¶ 29). However, according to the portions of the hearing transcript

----

[12]Although it is not clear from the cited portion of the transcript, it appears that Greenway is testifying regarding the videotape surveillance he took of Van Deelen's activities on November 8, 2002.

Case 4:04-cv-00989-GAF   Document 116   Filed 01/30/06   Page 18 of 39

cited by the City in support of this assertion, only the November 6, 2002 videotape surveillance was produced at this hearing during the testimony of Jarrett. (Doc. #74, Ex. Q, 46-54). The November 6, 2002 videotape surveillance was admitted into evidence by Van Deelen. (Doc. #74, Ex. Q, 53:24-25).

Van Deelen claims that through discovery in the present action, he obtained and viewed videotapes of the November 6, 2002 and November 7, 2002 surveillances as well as the video taken by Defendant Greenway on November 8, 2002. (Doc. #68, ¶ 160). Van Deelen contends that the tapes controvert the testimony given by Jarrett, Loopey and Defendant Greenway before the HR Board about surveillance times. Id. According to Van Deelen, the surveillance times shown on the tape are "significantly different" from the surveillance times testified to by Jarrett, Loopey and Defendant Greenway. Id.

On November 25, 2003, the HR Board sustained the City's decision to terminate Van Deelen's employment for violating the City's residency policy. (Doc. #68, Ex. 11). Based on the testimony and exhibits presented at the HR Board hearings, the HR Board found that Van Deelen violated Sec. 2-972 of the Code of Ordinances when he failed to establish his residence in Kansas City, Missouri and that his actions were cause for dismissal from the municipal service. Id.

### F. *Subsequent Appeals and Present Procedural Posture*

On December 1, 2003, consistent with the provisions of Sec. 125 of the City Charter, Van Deelen appealed the HR Board's affirmation of the termination of his employment to the City Manager, Defendant Wayne Cauthen ("Cauthen"). (Doc. #68, ¶¶ 174-178). On February 19, 2004, Defendant Cauthen affirmed the decision of the HR Board. (Doc. #68, ¶ 179). Pursuant to Mo. Rev. Stat. §§ 536.100 – 536.140, Van Deelen filed a petition for review of the HR Board's decision in the Circuit Court of Jackson

19

County. (Doc. #68, Ex. Q, Case No. 04-CV-206594).

Van Deelen has also filed this separate action asserting various violations of his Constitutional rights. Van Deelen argues that the City's residency policy, as applied to him, is unconstitutionally vague and ambiguous in violation of the Fourteenth Amendment. Van Deelen contends that his right to procedural due process, also protected by the Fourteenth Amendment, was violated during the HR Board hearings when Loopey refused to answer questions about his employment as an undercover narcotics officer and when Jarrett, Loopey and Defendant Greenway failed to comply with subpoenas requesting the production of all evidence related to the surveillance of Van Deelen's activities. Van Deelen also argues that his Fourteenth Amendment substantive due process rights were violated by the Defendants' "truly irrational and sufficiently outrageous" conduct. Finally, Van Deelen contends that the City's residency policy violates the Equal Protection Clause of the Fourteenth Amendment.

## II. The HR Board's Motion for Judgment on the Pleadings

The HR Board contends that it should be dismissed from this action because its liability is subsumed in the liability of the City because it is a Department of the City. A motion to dismiss tests the sufficiency of the complaint. Bennett v. Tyson Foods, Inc., 2005 WL 1668147, *2 (E.D. Mo. 2005). Dismissal is appropriate only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which could entitle him to relief." McCormick v. Aircraft Mechanics Fraternal Ass'n, 340 F.3d 642, 644 (8th Cir. 2003). When considering this Motion, the Court will assume that all facts alleged in the complaint are true and liberally construe those allegations in a light most favorable to Van Deelen. *See* Midwestern Machinery, Inc. v. Northwest Airlines, Inc., 167 F.3d 439, 441 (8th Cir. 1999).

The City's Charter organizes and structures the City's executive and administrative work into

departments. (Kansas City, Missouri City Charter, Art. III, Sec. 25). In Art. V of the City's Charter, the Personnel Department is established. Within the Personnel Department, Section 111 of Art. V of the City's Charter establishes a "personnel board."[13] Article V, Sec. 111 empowers the personnel board to review actions to remove, demote or suspend employees of the City upon such employee's request. According to the City, the personnel board created by Art. V, Sec. 111 is more commonly referred to as the "Human Resources Board," a Defendant in this case.

A local governmental entity, such as the HR Board, which lacks the capacity to be sued under the state law may not be sued in federal court under the provisions of Fed. R. Civ. P. 17. *See* Catlett v. Jefferson County, 299 F.Supp.2d 967, 968-69 (E.D.Mo. 2004). "The Missouri Supreme Court held long ago that Departments of a municipality cannot be sued unless statutory authorization to sue and be sued has been given to the departments." Catlett, 299 F.Supp.2d at 969. According to the Missouri Supreme Court:

> The health department, water department, sewer department, or any other department or utility of a city, unless expressly made suable by statute, cannot be sued either on a contract or for a tort; and this for the reason that if liability exists, the city itself is the party liable, and not the particular department the conduct of which gave rise to the cause of action.

Catlett, 299 F.Supp.2d at 969 *quoting* American Fire Alarm Co. v. Bd. of Police Comm'rs of Kansas City, 285 Mo. 581, 227 S.W. 114, 116 (1920).

A Missouri federal district court interpreting Missouri law has specifically found that a Personnel Department is an "integral part" of city government "and is merely the administrative arm whereby

---

[13]Kansas City, Missouri, City Charter, Art. V, Sec. 111 provides, "There is hereby created in the personnel department a personnel board . . ."

employment functions are performed." State of Missouri v. Wochner, 475 F.Supp. 274, 280 (E.D. 1979). A "Department of Personnel lacks a legal identity apart from that of the [City], and as such is not a suable entity." Wochner, 475 F.Supp. at 280.

Here, Van Deelen has named the Human Resources Board, a functioning committee in the City's Personnel Department, as a Defendant in this case. Van Deelen does not point this Court to any statutory authorization for the Human Resources Board to sue or be sued. In the event that Van Deelen prevails against the Human Resources Board, the City itself will be liable. Therefore, the Human Resources Board is a mere Department of the City and is not a separate legal entity subject to suit under 42 U.S.C. § 1983. Consequently, Van Deelen can prove no set of facts in support of his claim against the Human Resources Board entitling him to relief. Any claims based on the conduct of the Board are properly asserted against the City, who is a named Defendant in the present action. Accordingly, the HR Board's Motion for Judgment on the Pleadings is GRANTED and the Human Resources Board is HEREBY DISMISSED from the present action.

## III.    Summary Judgment Standard

The three Motions for Summary Judgment presently pending before the Court were filed pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. According to this Rule, summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering these Motions, the Court views all facts in the light most favorable to the non-moving party and gives him the benefit of all reasonable inferences. See Prudential Ins. Co. v. Hinkel, 121 F.3d 364, 366 (8th Cir. 1997). The Court

22

will not weigh the credibility of the evidence, but rather will focus on whether a genuine issue of material fact exists for trial. Roberts v. Browning, 610 F.2d 528, 531 (8th Cir. 1979); United States v. Porter, 581 F.2d 698, 703 (8th Cir. 1978).

An issue of material fact is "genuine" if "the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). When the evidence supports conflicting conclusions, a *genuine* issue of material fact exists and summary judgment should be denied. Kells v. Sinclair Buick—GMC Truck, Inc., 210 F.3d 827 (8th Cir. 2000) (emphasis added). The "materiality" of a disputed fact is determined by the substantive law governing the claim. Anderson, 477 U.S. at 248. "Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material." Liebe v. Norton, 157 F.3d 574, 578 (8th Cir. 1998) *citing* Anderson, 477 U.S. at 248.

The summary judgment rule is intended "to isolate and dispose of factually unsupported claims" and should be applied to accomplish this purpose. Prudential Ins. Co., 121 F.3d at 366. In the interest of promoting judicial economy, summary judgment should be granted to prevent the trial of cases lacking a genuine issue of material fact. Inland Oil and Transp. Co. v. U.S., 600 F.2d 725, 728 (8th Cir. 1979).

As a preliminary matter, the Court notes that the parties furiously dispute the evidence supporting the HR Board's decision to affirm the termination of Van Deelen's employment with the City for violating the City's residency policy. These factual disputes are likely relevant to the question of whether or not Van Deelen was wrongfully discharged, a question presently pending before the Jackson County Circuit Court in Case No. 04-CV-206594. However, these factual disputes are not germane to the Constitutional claims disposed of in this Order.

Case 4:04-cv-00989-GAF   Document 116   Filed 01/30/06   Page 23 of 39

The Defendants object to any factual assertions which Van Deelen claims are supported by his affidavit contending that these assertions are "based entirely on hearsay and on plaintiff's own self-serving, unsubstantiated statements." (Doc. #78). Fed. R. Civ. P. 56 specifically provides that a the Court is entitled to consider affidavits when ruling on a motion for summary judgment so long as the affidavit is made on the affiant's personal knowledge and sets forth facts that would be admissible at trial. Obviously, Van Deelen's affidavit itself is hearsay, i.e. an out-of-court statement offered for the truth of the matter asserted, and would not be admissible at trial unless otherwise agreed upon by the parties. However, similarly so, all of the affidavits and deposition testimony offered by the Defendants in support of their Motions for Summary Judgment is also hearsay and would not be admissible at trial to prove the facts contained therein. The summary judgment standard specifically permits the Court to consider this type of evidence in ruling on motions for summary judgment under the expectation that the content of the affidavits and deposition testimony reflects the evidence that will be presented at trial.

To the extent that the facts asserted by Van Deelen in his affidavit relate to an out-of-court statement made by a Defendant, such statements are considered not to be hearsay pursuant to Fed. R. Evid. 801(d)(2)(A). Furthermore, statements by a Defendant's agent would also not be considered inadmissible hearsay pursuant to Fed. R. Evid. 801(d)(2)(D). These statements would be admissible against the Defendant at trial, even if the declarant is available to testify at trial. However, once a party's out-of-court admission is entered into evidence against him, he is entitled to offer evidence which contradicts his out-of-court statement. Therefore, the Court does not find that the statements contained in Van Deelen's affidavit which fall under these hearsay exceptions, must be disregarded by the Court in determining the propriety of summary judgment.

24

Further, the Court does not find that the factual assertions supported by Van Deelen's affidavit must be disregarded pursuant to the rule that a plaintiff may not rely on his own self-serving affidavits to establish a genuine issue of material fact for trial. (*See* Doc. #78). The Court considers this rule to govern circumstances where the plaintiff, in response to a motion for summary judgment, asserts facts that are wholly unsupported by documentary evidence in an effort to demonstrate a genuine issue of material fact for trial. *See* O'Bryan v. KTIV Television, 64 F.3d 1188, 1191 (8th Cir. 1995) *citing* Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 945 (8th Cir. 1994). Here, Van Deelen's affidavit was not drafted in response to the Defendants' Motions for Summary Judgment. Rather, Van Deelen's affidavit was drafted prior to the filing of the Defendants' Motions for Summary Judgment. Van Deelen's affidavit was sworn and attested to on September 7, 2005. (Doc. #68, Ex. A). Both the City Defendants and the HR Board Defendants filed their respective Motions for Summary Judgment on September 20, 2002. (Doc. #71, #73). Van Deelen, like the Defendants, is entitled to testify on his own behalf. Accordingly, the Court finds that Van Deelen's affidavit is not "self-serving" and may be considered by the Court in ruling on the present Motions.

**A.  The City Defendants' Motion for Summary Judgment**

1.  City's Residency Policy is Unconstitutionally Vague and Ambiguous

Van Deelen contends that the City's residency policy is unconstitutionally vague and ambiguous because there is no uniform interpretation of what is required to comply with the policy. Van Deelen's "void for vagueness" argument is rooted in the Due Process Clauses of the Fifth and Fourteenth Amendments. *See* Stephenson v. Davenport Community School District, 110 F.3d 1303, 1308 (8th Cir. 1997) *reh'g and suggestion for reh'g en banc denied* (May 30, 1997). A vague regulation violates the

25

Due Process Clause in two respects. <u>Id</u>. "First, the doctrine of vagueness 'incorporates notions of fair notice or warning' and a regulation 'violates the first essential of due process of law' by failing to provide adequate notice of prohibited conduct." <u>Stephenson</u>, 110 F.3d at 1308 *quoting* <u>Smith v. Goguen</u>, 415 U.S. 566, 572 and <u>Connally v. General Constr. Co.</u>, 269 U.S. 385, 391 (1926). Therefore, a regulation is unconstitutionally vague it if "forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess as to its meaning and differ as to its application." <u>Stephenson</u>, 110 F.3d at 1308 *quoting* <u>Connally</u>, 269 U.S. at 391. Secondly, the void-for-vagueness doctrine "prevents arbitrary and discriminatory enforcement." <u>Stephenson</u>, 110 F.3d at 1308 *quoting* <u>Goguen</u>, 415 U.S. at 573. "A vague law impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis." <u>Stephenson</u>, 110 F.3d at 1308 *quoting* <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108-09 (1972).

The Court finds that the parties have raised a genuine issue of material fact as to whether the City's residency policy is unconstitutionally vague and ambiguous as applied to Van Deelen. The City asserts that "residence" is clearly defined in the text of the ordinance. According to the City, "it is obvious that most persons of ordinary intelligence understand the meaning of the terms" of the ordinance.

However, Van Deelen has presented sufficient evidence to the contrary from which a reasonable factfinder could conclude that the City's residency policy was unconstitutionally vague and ambiguous as applied to him. The evidence submitted by Van Deelen could support the conclusion that the City did not clearly and consistently interpret and enforce its residency policy. When questioned about the "operative definition of residency," Defendant Thigpen stated that he would consider "where an employee spent the majority of their time; [w]here they left from, where they came back to, where they intended to return,

where their family was." Repeatedly, Defendant Thigpen stated that an employee's compliance with the City's residency policy would be determined based on the "preponderance of evidence." However, it is not clear what specific factors or evidence would be considered in determining whether an employee is violating the City's residency policy. Defendant Thigpen was also unable to define certain key terms appearing in Sec. 2-972 such as "permanent home," "true home" and "fixed home."

According to Defendant Thigpen, employees were able to seek advice regarding compliance with the City's residency policy from one of the City's approximately 200 supervisors. Defendant Thigpen and Defendant Roper hoped that the supervisors would contact the Human Resources Department before answering employee questions. However, there is no evidence in the record of any written materials or training provided to supervisors regarding the proper interpretation and application of the City's residency policy or encouraging the supervisors to confer with the Human Resources Department prior to responding to employee inquires about the City's residency policy.

Even if a supervisor consulted the Human Resources Department about the interpretation and application of the City's residency policy, the record reveals that there is no clear and consistent position on what constitutes compliance with the City's residency policy being circulated among Human Resources personnel. Van Deelen states that he contacted Human Resources personnel directly seeking advice about the City's residency policy. They informed him that the City's residency policy applied only to him and not to his family and that he could satisfy the requirement by renting an apartment in Kansas City, Missouri and staying in the apartment on nights before work days (i.e. Sunday, Monday, Tuesday, Wednesday, and Thursday). Van Deelen was not informed about any specific factors or evidence, i.e. a drivers license, a bank account, the receipt of mail, etc., that would be considered by the City in determining his compliance

27

with residency requirement.

The record before the Court reveals a great deal of confusion surrounding the interpretation and enforcement of the City's residency policy. The City does not appear to have any written procedures or guidelines governing the residency requirements or the City's investigation into potential violations of the policy. In fact, no one knows who initiated the residency complaint against Van Deelen. The record does not reflect that the City's Human Resources Department has developed a clear and consistent interpretation of the City's residency policy. New employees are not provided with any guidance on compliance with the policy, aside from what appears in the Human Resources Manual and Sec. 2-972 of the Code of Ordinances. Supervisors are not instructed on how to respond to employee inquiries regarding the policy. Furthermore, the City Defendants admit that the City does not have any policies or ordinances which govern residency determination investigations or the surveillance of employees during those investigations. This lack of a clear and consistent interpretation and enforcement of the City's residency policy is apt to lead to ad hoc determinations of when the policy has been violated and which employees should be investigated for potential residency violations.

Based on the facts and arguments presented by the parties, a genuine issue of material fact exists regarding whether or not the City's residency policy was unconstitutionally vague and ambiguous as applied to Van Deelen. Neither party has presented sufficient legal authority for this Court to resolve this issue as a matter of law. Accordingly, Summary Judgment is DENIED on Van Deelen's claim that the City's residency policy is unconstitutionally vague and ambiguous and this claim will proceed to trial.

2. Fourteenth Amendment Procedural Due Process

Van Deelen contends that his right to procedural due process, protected by the Fourteenth

28

Amendment, was violated in the hearings before the HR Board when Jarrett, Loopey and Defendant Greenway failed to comply with subpoenas seeking videotapes and other documentary evidence of the surveillance of Van Deelen's activities. Van Deelen further argues that Loopey's refusal to answer questions about his past and concurrent employment as an undercover narcotics officer constituted a violation of Van Deelen's procedural due process rights.

The Due Process Clause of the Fourteenth Amendment provides that, "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Procedural due process claims require a two-step analysis. Krentz v. Robertson Fire Prot. Dist., 228 F.3d 897, 902 (8th Cir. 2000). First, a plaintiff must demonstrate that the state deprived him of some "life, liberty, or property" interest. Krentz, 228 F.3d at 902. This portion of the analysis is undisputed; the parties agree that because Van Deelen could only be terminated "for cause" pursuant to Sec. 2-1114 of the Code of Ordinances, Sec. 7.5 of the City's Human Resources Rules and Policy Manual and Sec. 125 of the City Charter, Van Deelen had a property interest in continued employment with the City. (Doc. #74, #68).

As Van Deelen has a protected property interest in continued employment with the City, Van Deelen must prove that the City deprived him of that interest without sufficient "process" to establish a prima facie procedural due process claim. *See* Krentz, 228 F.3d at 902. The central precept of the procedural due process guaranteed by the 14th Amendment is that "the deprivation . . . of property . . . be preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 542 (1985) *quoting* Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950). The Supreme Court has held that "the root requirement" of the Due Process

Case 4:04-cv-00989-GAF    Document 116    Filed 01/30/06    Page 29 of 39

Clause is "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." Loudermill, 470 U.S. at 542 *quoting* Boddie v. Connecticut, 401 U.S. 371 (1971) (emphasis in original). The Eighth Circuit has interpreted Loudermill as dividing procedural due process claims into three stages:

> Initially, an employee receives notice that he will be terminated, and he is given an opportunity to respond: that is "pretermination process." Then, the employer actually fires the employee. Finally, in the third stage, an employee has an opportunity to receive some measure of post-termination process, usually a hearing with heightened procedural safeguards.

Krentz, 228 F.3d at 902.

In the pretermination process, "the tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence and an opportunity to present his side of the story." Loudermill, 470 U.S. at 546. Here, Van Deelen does not contest the initial process that he received in the Predetermination Hearing. Rather, Van Deelen's procedural due process claim focuses on the post-termination process he received in the Hearings before the HR Board.

Pursuant to Sec. 125 of the City Charter, Van Deelen was entitled to appeal Defendant Roper's decision to terminate his employment with the City's ITD to the HR Board. Section 16 of the Rules and Regulations of the HR Board provided that Hearings before the HR Board constituted "contested cases as set forth in Chapter 536, Revised Statutes of Missouri." Accordingly, the Board and its Hearings "will adhere to all applicable sections [of] Chapter 536, RSMo." The Eighth Circuit has observed that the "contested cases" provisions of Chapter 536 "contemplate extensive proceedings." Krentz, 228 F.3d at 904, FN 7. The Eighth Circuit has concluded that the contested case provisions of Chapter 536 of the Missouri Revised Statutes "comport with post-termination requirements imposed by the Due Process

30

Clause." Krentz, 228 F.3d at 904. The Eighth Circuit proceeded to state, "[t]he extensive procedural protections provided in Mo. Rev. Stat. § 536.070 suffice to protect the constitutional interests of aggrieved employees in post-termination proceedings." Id. Finally, the Eighth Circuit concluded, a "contested case is tantamount to a full post-termination hearing." Id.

Van Deelen contends that his procedural due process rights were violated because Jarrett, Loopey and Defendant Greenway failed to comply with subpoenas issued by Van Deelen seeking "all documents and records detailing or related to the surveillance of Michael Van Deelen." Jarrett, Loopey and Defendant Greenway failed to produce the Time and Cost Summaries of Jarrett and Loopey which revealed three additional surveillances of Van Deelen on November 4, 5, and 6, 2002. Van Deelen claims that on these dates he went directly from work to his apartment at 3004 Grand Street in Kansas City, Missouri. Additionally, Jarrett, Loopey and Defendant Greenway failed to produce the videotape of the surveillance conducted on November 7, 2002.[14] Upon reviewing this videotape, Van Deelen contends that the surveillance times shown on the tape are "significantly different" from the surveillance times testified to by Jarrett, Loopey and Defendant Greenway.

Van Deelen maintained throughout the HR Board Hearings that his residence was the apartment at 3004 Grand Street in Kansas City, Missouri, rather than the Eudora, Kansas address. The HR Board, after reviewing all of the evidence presented by Van Deelen in support of his position, affirmed the City's

_____

[14]The videotape of the November 6, 2002 surveillance was produced at the March 4, 2003 hearing before the HR Board during Jarrett's testimony and Van Deelen admitted this videotape into evidence. The videotape of the November 8, 2002 surveillance was eventually produced by the City at the August 5, 2003 hearing, although Van Deelen refused to view it. As both of these videotapes were produced, Van Deelen cannot argue that his procedural due process rights were violated by their nonproduction.

31

decision to terminate his employment for violating the City's residency policy. Because the HR Board did not believe that Van Deelen was actually residing at the Kansas City, Missouri apartment, the evidence of the additional surveillances, even if it showed that Van Deelen had gone to his apartment on three occasions, is not sufficiently material to establish that had the HR Board been presented with this evidence, they would have found that Van Deelen did not violate the City's residency policy. Furthermore, consistent with the testimony of Jarrett and Loopey's supervisor, Defendant Greenway, these additional surveillances would not have been recorded in either the Detail Surveillance Record or the Mike Van Deelen Surveillance record when Jarrett and Loopey had missed Van Deelen at either the beginning or end of a trip. With respect to the alleged discrepancies in the time which appears on the videotape and the times testified to by Jarrett, Loopey and Defendant Greenway at trial, the Court finds that because there is no dispute that the videotapes show Van Deelen at the Eudora, Kansas residence on those dates, changes in the exact time of his arrival and departure therefrom are not sufficiently material to affect the HR Board's decision. When viewed in light of all the evidence and testimony presented by Van Deelen at the HR Board hearing, the evidence of the additional surveillances is not sufficiently material to alter the HR Board's conclusion; therefore, Van Deelen's procedural due process rights were not violated by their non-production.

Van Deelen further contends that his procedural due process rights were violated because Loopey refused to answer questions about his past and concurrent employment as an undercover narcotics investigator. The Court finds that this testimony is irrelevant as it does not tend to prove that Van Deelen was or was not in compliance with the City's residency policy. Accordingly, Van Deelen's procedural due process rights were not violated by Loopey's refusal to answer questions about his past and concurrent

32

employment as an undercover narcotics investigator.

The City Defendant's Motion for Summary Judgment on Van Deelen's claim that the proceedings before the HR Board violated his Fourteenth Amendment right to procedural due process is GRANTED.

3.    Fourteenth Amendment Substantive Due Process

In his Motion for Summary Judgment, Van Deelen asserts that "the defendants' actions against the plaintiff were truly irrational and sufficiently outrageous to violate plaintiff's substantive due process rights." (Doc. #68).  "Substantive due process prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998) citing United States v. Salerno, 481 U.S. 739, 746 (1987).  Substantive due process claims present themselves in two forms.  Weiler, 137 F.3d at 1051.  First, "the state violates substantive due process when it infringes 'fundamental' liberty interests, without narrowly tailoring that interference to serve a compelling state interest."  Weiler, 137 F.3d at 1051 citing Reno v. Flores, 507 U.S. 292, 301-02 (1993).  Van Deelen has not asserted a substantive due process claim under this "fundamental rights" theory.  Rather, Van Deelen has asserted the second type of substantive due process claim: that the Defendants violated his substantive due process rights when they "engage[d] in conduct that is so outrageous that it shocked the conscience or otherwise offends 'judicial notions of fairness, or is offensive to human dignity.'" Weiler, 137 F.3d at 1051 quoting Weimer v. Amen, 870 F.2d 1400, 1405 (8th Cir. 1989).

Van Deelen has failed to establish that any of the Defendants' actions were so outrageous as to shock the conscious.  Van Deelen bears the burden of establishing that the Defendants' actions were "truly

33

irrational," that is "something more than . . . arbitrary, capricious, or in violation of state law." Weiler, 137 F.3d at 1051 *quoting* Chesterfield Dev. Corp. v. City of Chesterfield, 963 F.2d 1102, 1104 (8th Cir. 1992). The facts alleged by Van Deelen do not support the conclusion that the Defendants' actions in terminating his employment for violating the City's residency policy were "truly irrational" or "sufficiently outrageous" to sustain a substantive due process claim. Van Deelen was afforded a Predetermination Hearing prior to his termination and a post-termination hearing before the HR Board. Van Deelen was entitled to the enforcement of the subpoenas he issued to Jarrett, Loopey and Defendant Greenway, but he failed to seek this remedy. Accordingly, Van Deelen has failed to present sufficient facts from which a jury could conclude that the Defendants' actions violated Van Deelen's substantive due process rights. Therefore, the City Defendants' Motion for Summary Judgment on Van Deelen's claim that his Fourteenth Amendment substantive due process rights were violated is GRANTED.

### 4. Fourteenth Amendment Equal Protection Clause

Van Deelen asserts that the City's residency policy violates his right to equal protection under the laws because it impinges on his freedom to travel, associate and pursue a relationship with his family. (Doc. #68, Doc. #82). The City contends that its residency policy does not violate any provision of the Constitution. (Doc. #74). To determine whether the City's residency policy violates the Equal Protection Clause, the Court begins by considering "the character of the classification in question, the individual interests affected by the classification and the governmental interests asserted in support of the classification." Dunn v. Blumstein, 405 U.S. 330, 335 (1972). The Court has developed more than one test, depending on the interest affected and/or the classification involved, to apply when determining whether a challenged state action violates the Equal Protection Clause. Id. In the present case, the basis

34

for the classification is an individual's present and continuing residence and the benefit withheld by the classification is city employment.

The Supreme Court carefully distinguishes between two types of residency requirements. "On several occasions the Court has invalidated requirements that condition receipt of a benefit on a minimum period of residence within a jurisdiction, but it always has been careful to distinguish such durational residence requirements from bona fide residence requirements." Martinez v. Bynum, 461 U.S. 321, 325 (1983). To determine the existence of a bona fide residence requirement, the Court examines the definition of "residence" used in the requirement. Martinez, 461 U.S. at 330. According to the Supreme Court, the following definition of "residence," originally articulated by the Supreme Court of Maine, is a "classic two-part definition" which "has been recognized as a minimum standard in a wide range of contexts time and time again":

> When . . . a person voluntarily takes up his abode in a given place, with intention to remain permanently, or for an indefinite period of time; or, to speak more accurately, when a person takes up his abode in a given place, without any present intention to remove therefrom, such place of abode becomes his residence.

Martinez, 461 U.S. at 331 *quoting* Inhabitants of Warren v. Inhabitants of Thomaston, 43 Me. 406, 418 (1857). In a subsequent case, the Supreme Court found that the following definition of residence, within the context of public education, constituted a bona fide residence requirement:

> In general, the [residence] of an individual is his true, fixed and permanent home and place of habitation. It is the place to which, whenever he is absent, he has the intention of returning.

Martinez, 461 U.S. at 331 *quoting* Vlandis v. Kline, 412 U.S. 441, 454 (1973). In Sec. 2-972, "residence" is defined as "where a person has his true, fixed, and permanent home and principal

35

establishment and to which, whenever he is absent, he has the intention of returning." This definition is virtually identical to the definition of residence found in Vlandis. Accordingly, the City's residency policy constitutes a bona fide residence requirement because it grants the benefits of residency to all who satisfy the traditional requirements. *See* Martinez, 461 U.S. at 332 (finding that the residency requirement at issue in that case constituted a bona fide residence requirement because it granted the benefits of residency to all who satisfy the traditional requirements).

"A bona fide residence requirement implicates no 'suspect' classification, and therefore is not subject to strict scrutiny. Indeed, there is nothing invidiously discriminatory about a bona fide residence requirement if it is uniformly applied." Martinez, 461 U.S. at 329, FN 7. Therefore, bona fide residence requirements are subject to the rational basis test. Id.[15] The rational basis test is the most deferential standard of review and under this test, "a challenged classification 'will not be set aside if any state of facts reasonably may be conceived to justify it.'" Stiles v. Blunt, 912 F.2d 260, 263 (8th Cir. 1990) *quoting* McGowan v. Maryland, 366 U.S. 420, 426 (1961). "The rational relationship test accords substantial deference to the government both in determining what constitutes a legitimate governmental objective and in selecting the means to accomplish the chosen objective." Stiles, 912 F.2d at 263. The Court will uphold a statute challenged under the rational relationship test, "so long as it bears a rational relationship to a governmental objective not prohibited by the Constitution." Id. Under the rational basis test, "the

_____

[15]*Compare to* Dunn v. Blumstein, 405 U.S. 330 (1972) (requiring the state to show a substantial and compelling reason for imposing durational residence requirements on the right to vote); and Memorial Hospital v. Maricopa County, 415 U.S. 250 (1974) (applying the compelling state interest test to a state statute requiring a year's residence in a county as a condition to an indigent's receipt of nonemergency hospitalization or medical care at the county's expense).

Case 4:04-cv-00989-GAF   Document 116   Filed 01/30/06   Page 36 of 39

classification is presumed constitutional and the plaintiff bears the burden of proving otherwise." Id.

As the City's residency policy constitutes a bona fide residency requirement, it is subject to scrutiny under the rational basis test. Under this test, Van Deelen bears the burden of establishing that there is no rational basis for the City's residency policy. Van Deelen has failed to satisfy this burden. A number of potential rational bases exist supporting the City's residency policy including the recruitment and retention of employees who are highly motivated and deeply committed to the City in which they live and work, enhancement of the quality of employee performance due to the greater knowledge of City conditions and the greater personal stake in the City's progress, reduction in absenteeism and tardiness due to the proximity of the employee's work and home, the availability of employees trained to respond to emergency situations, and the general economic benefits flowing from local expenditure of employees' salaries. Van Deelen has failed to negate any of these rational bases. Accordingly, the City Defendant's Motion for Summary Judgment on Van Deelen's claim that the City's residency policy violates his Fourteenth Amendment right to equal protection under the law is GRANTED.

5.    Punitive Damages

In their Motion for Summary Judgment, the City Defendants contend that Van Deelen is not entitled to punitive damages from the City. (Doc. #74). In response, Van Deelen recognizes that nothing in the City Defendants' argument precludes him from recovering punitive damages from the other City Defendants. (Doc. #82). This Court finds that Van Deelen is not entitled to recover punitive damages from the City. Therefore, the City Defendants' Motion for Summary Judgment on Van Deelen's punitive damages claim is GRANTED as to the City and DENIED as to Defendants Wayne Cauthen, John Franklin, John Thigpen, Gail Roper, Richard Razniak, Beth Lacey, Rick Brisbin, Roy Greenway and

Patrick Reisenbichler.

**B.      The HR Board Defendants' Motion for Summary Judgment**

The only HR Board Defendant remaining is Joseph Moreland ("Moreland"). He contends that the doctrine of qualified immunity shields him from liability. The Court has determined that Van Deelen is not entitled to relief on the merits of all of his claims, with the exception of his claim that the City's residency policy is unconstitutionally vague and ambiguous. There is no evidence in the record that Moreland was responsible for promulgating, interpreting or enforcing the City's residency policy. Rather, Moreland was responsible for reviewing the factual basis for Van Deelen's termination based on the interpretation and enforcement of the City's residency policy by the City Defendants. As Moreland was not responsible for drafting Sec. 2-972 of the City Ordinance or determining how the ordinance would be applied and enforced, Van Deelen cannot recover damages from Moreland on this claim. As the Constitutional claims related to Moreland's actions have already been resolved on the merits, the Court need not determine at this stage of the proceedings whether Moreland is entitled to qualified immunity. Accordingly, the HR Board Defendants' Motion for Summary Judgment is GRANTED.

**C.      Van Deelen's Motion for Summary Judgment**

Pursuant to the above analysis, Van Deelen's Motion for Summary Judgment is DENIED.

**CONCLUSION**

The HR Board has established that as a Department of the City, its liability is subsumed in the liability of the City. Accordingly, the HR Board is dismissed as a separate Defendant in this action. The City Defendants' have established that Van Deelen is unable to prove that his procedural due process, substantive due process and equal protection rights under the Fourteenth Amendment have been violated.

38

Accordingly, Van Deelen has failed to present sufficient evidence to support the claims related to the conduct of the remaining HR Board Defendant, Joseph Moreland. However, a genuine issue of material fact exists regarding whether the City's residency policy was unconstitutionally vague and ambiguous as applied to Van Deelen. Therefore, this claim will proceed to trial.

Based on the foregoing analysis,

- The HR Board's Motion for Judgment on the Pleadings is GRANTED. (Doc. #33).

- The City Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part. (Doc. #73).

- The HR Board Defendants' Motion for Summary Judgment is GRANTED. (Doc. #71).

- Van Deelen's Motion for Summary Judgment is DENIED. (Doc. #68).

**IT IS SO ORDERED.**

/s/ Gary A. Fenner
GARY A. FENNER, JUDGE
United States District Court

DATED:   January 27, 2006

Case 4:04-cv-00989-GAF   Document 116   Filed 01/30/06   Page 39 of 39